IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

United States of America,      ) Criminal Action
                                ) No. 21-mj-00115-RMM
                Plaintiff,      )
                                ) **Detention Hearing** (via Zoom)
        vs.                     )
                                )
Emanuel Jackson,                ) Washington, D.C.
                                ) January 25, 2021
                Defendant.      ) Time:  11:47 a.m.
_____

Transcript of **Detention Hearing** (via Zoom)
Held Before
The Honorable G. Michael Harvey (via Zoom)
United States Magistrate Judge

_____

A P P E A R A N C E S

For the Plaintiff:      **Anthony F. Scarpelli**
(via Zoom)              **Gilead I. Light**
                        U.S. ATTORNEY'S OFFICE FOR THE
                        DISTRICT OF COLUMBIA
                        555 Fourth Street, Northwest
                        Washington, D.C. 20530

For the Defendant:      **Brandi J. Harden**
(via Zoom)              Harden|Pinckney, PLLC
                        400 7th Street, Suite 604
                        Washington, D.C. 20004

Also Present:           Christine Schuck, Pretrial Services
(via telephone)         Officer

_____

Transcribing Court Reporter:
                        Nancy J. Meyer
                        Registered Diplomate Reporter
                        Certified Realtime Reporter
                        United States Courthouse, Room 6509
                        333 Constitution Avenue, Northwest
                        Washington, D.C. 20001
                        202-354-3118

```
 1                    P R O C E E D I N G S

 2          THE COURTROOM DEPUTY:  Judge, we have Case 21-mj-115,

 3   United States of America v. Emanuel Jackson.  This is scheduled

 4   to be a detention hearing by video.

 5          Would the parties please introduce themselves to the

 6   Court, beginning with the government.

 7          MR. SCARPELLI:  Good morning, Your Honor.  Anthony

 8   Scarpelli and Gilead Light on behalf of the United States.

 9          MS. HARDEN:  Good morning, Your Honor.  Brandi Harden

10   (inaudible) on behalf of Mr. Emanuel Jackson, who's present via

11   Zoom video.

12          THE PRETRIAL SERVICES OFFICER:  And Christine Schuck

13   with pretrial services.

14          THE COURT:  Good afternoon, Mr. Jackson.  Can you

15   hear me?

16          Okay.  Mr. Jackson, I'm going to ask that you mute.

17   There's often noise there at the jail.  If at any point you --

18   you wish to say something or speak with your attorney, just

19   raise your hand.  I'll see you; okay?  And I'll make sure you

20   have the opportunity to do that, but I ask you to please mute

21   there so that we don't hear the background noise from the jail.

22   Are you able to do that?

23          THE DEFENDANT:  I'm not on mute?  Okay.

24          THE COURT:  Mr. Tran, can you tell?

25          THE COURTROOM DEPUTY:  He is unmuted -- he's muted,
```

1    Judge.

2              THE COURT:  Okay.  Great.  Thank you.

3         So this matter has been scheduled for a detention

4    hearing.  Is the government ready to proceed?

5              MR. SCARPELLI:  We are, Your Honor.

6              THE COURT:  Ms. Harden, are you ready as well?

7              MS. HARDEN:  I am.

8              THE COURT:  Ms. Harden, does the defendant waive any

9    rights he may have for an in-person detention hearing; agree to

10   proceed by video because of the pandemic?

11             MS. HARDEN:  Yes, Your Honor.

12             THE COURT:  I want the parties to know that I have

13   reviewed as well as -- the government's detention memo.  As

14   part of your opposition, I've reviewed -- it's hard for me.  I

15   think I've reviewed -- there's five exhibits I've reviewed.

16   But, anyway, I was unable to open or operate Exhibit 1.  It had

17   content and was something more than just a program from which I

18   can view the other videos.  I haven't seen them.  So either the

19   government can attempt during this hearing (inaudible) to share

20   their screen or maybe you'll just have to describe to me

21   what -- what that (inaudible), but, again, we should proceed.

22   I have seen the other four:  Exhibits 2, 3, 4, and 5.

23             MR. SCARPELLI:  Sure.

24             THE COURT:  Government --

25             MR. SCARPELLI:  Yeah, I can -- I can attempt to show

1   you that video.  That's the video of the mob entering the --

2   the doorway where the defendant assaulted a police officer.  I

3   will attempt during my presentation to show it to the Court and

4   defense counsel.

5          THE COURT:  Just to be clear, I think I've seen it.

6   It sounds like the government is alleging the defendant twice

7   encountered law enforcement upon entry into the Capitol.  I

8   think the (inaudible) that they show an individual, which the

9   government is purporting to be the defendant, with a baseball

10  bat assaulting law enforcement.  So, I mean, (inaudible) -- I

11  think those videos are all connected.  If there was another

12  offense earlier, I think it will show -- I've not seen any

13  videos of that.  I think --

14         MR. SCARPELLI:  Let me just do this, Your Honor.  Can

15  you see that screenshot of -- that's the Exhibit 1, the first

16  video.  That's --

17         THE COURT:  Yes, I can.  That might work as well as

18  anything.  (Inaudible).

19         MR. SCARPELLI:  Okay.

20         THE COURT:  But I think the blowup views somehow

21  (inaudible) -- if you're going to attempt to show it that way,

22  I think I can try to get you pinned to my screen.  Yes.

23         MR. SCARPELLI:  Okay.  Okay.  Do you want me to show

24  it to (inaudible)?  It's not very long.  It's a few seconds.  I

25  can show it to you now and --

1          THE COURT:  Sure.  Ms. Harden, let me just ask.  You

2    were able to view this video; is that correct?

3          MS. HARDEN:  That is correct, Your Honor.  And if the

4    Court is asking me -- although I'm not volunteering -- I can

5    share my screen.  I -- I, you know, can share my screen

6    (inaudible) videos up.

7          THE COURT:  You know, I've -- I've never used Zoom.

8    I used the entire platform the government and the court used,

9    which was not -- was not -- not acceptable.  I don't know if

10   Zoom would be better.  You know, Mr. Scarpelli, why don't you

11   try to do what you were going to try to do here and see if that

12   works.

13         MR. SCARPELLI:  Sure.  Okay.  One moment, Your Honor.

14   My -- my screen is blanking out.  Here's mine.  (Inaudible).

15   Here's mine.

16         THE COURT:  Okay.

17         MR. SCARPELLI:  I -- I would like to proceed, and

18   once I get it up, we can -- we can discuss it.

19         THE COURT:  Sure.

20         MR. SCARPELLI:  Okay.  Your Honor, the -- the actions

21   of January 6th were a group of violent rioters -- which the

22   defendant was part of -- was historic, incredibly violent, and

23   horrifying to all Americans who watched this incident.  It

24   cannot be restated that the defendant armed himself with a

25   metal baseball bat in the midst of this violent mob attack.  He

1  assaulted law enforcement officers by striking them numerous

2  times with a bat.  The goal was to disable law enforcement and

3  eventually enter the U.S. Capitol to stop the electoral vote

4  count.

5       The defendant -- the government has detailed the facts

6  in a detention memo, but I feel that it's necessary just to

7  highlight some of the things.  As the Court is aware, on

8  January 6th, 2021, Congress was preparing to certify the vote

9  for the electoral college from the 2020 presidential election.

10  On that same day, Former President Trump held a rally with tens

11  of thousands of supporters attending.  The crowd eventually

12  walked to the U.S. Capitol, and at some point, the crowd armed

13  themselves with weapons to include pepper spray, zip ties,

14  bats, and other dangerous weapons.

15       It should be noted that the U.S. Capitol was closed to

16  the public that day.  Additionally, some individuals in the

17  crowd armed themselves with anti-teargas masks, bulletproof

18  vests, military-style equipment, to include protective helmets

19  with eye shields, and other protective-type equipment.  At

20  least some individuals were observed communicating with each

21  other via walkie-talkies and earpieces (inaudible).  As the

22  crowd grew larger, individuals were heard inciting the crowd

23  with bullhorns and verbally attacking law enforcement in

24  coordinated actions.

25       Members of the violent crowd were heard discussing that

1    they could overwhelm law enforcement because the violent crowd

2    substantially outnumbered law enforcement.  Shortly thereafter,

3    the crowd became violent, physically attacked police with

4    weapons, tearing down protective fencing, and spraying law

5    enforcement officers with pepper spray.  The crowd did, in

6    fact, overwhelm law enforcement, broke through the protective

7    fencing and attempted to storm the U.S. Capitol in an effort to

8    disrupt the certification of the electoral vote and presumably

9    do more inside the U.S. Capitol.

10        Defendant's actions were incredibly dangerous.  It

11    disabled law enforcement, and it allowed scores of individuals

12    to enter the U.S. Capitol.  First, at approximately 2:48 p.m.,

13    the defendant was part of a large violent crowd that had

14    already broken windows to the Senate-wing entrance, forcibly

15    opening a locked door in an effort for the mass to enter the

16    U.S. Capitol.  That was the still photograph I showed

17    Your Honor.  My computer is still trying to boot up.  I'll try

18    and get the video clip for you.

19        The defendant was up front in that group, and he is

20    observed striking officers multiple times with his fist in an

21    effort to gain entrance into the U.S. Capitol.  And you can

22    imagine the fear that law enforcement felt.  They were

23    substantially outnumbered, as you can see from that still

24    photograph I showed you, looking out at that crowd while they

25    were being assaulted.  And shortly after 2:48 p.m., the crowd

1    broke through, and one of the first individuals through that

2    crowd was the defendant.  The crowd (inaudible) around and

3    entered the U.S. Capitol.  But that wasn't sufficient for the

4    defendant.

5          At approximately 4:50 p.m., he's observed on

6    U.S. Capitol surveillance footage trying to gain entrance at

7    the West Terrace.  This doorway, as you can see from Exhibit 2

8    and 3, is being protected by law enforcement who have plexiglas

9    shields, are in riot gear, and are attempting to keep the crowd

10   out.

11         Standing next to the defendant is an individual who has

12   what looks to be a nightstick-type device, and he is striking

13   law enforcement.  He is also attempting to sort of bull rush

14   into the police in order to gain entry.  Right next to him is

15   an individual who's wearing a protective helmet and appears to

16   have a law enforcement (inaudible) and is striking the police

17   officers.

18         And right next to the two of them is the defendant,

19   armed with a black and red metal baseball bat.  And as you

20   can see from Exhibits 4 and 5, he repeatedly strikes the

21   police officers.  And, again, Your Honor, I -- I can't

22   underestimate the fear and concern that those officers must

23   have had looking out into that crowd in trying to protect the

24   Capitol.  At some point the defendant, it wasn't sufficient to

25   punch these officers, but he armed himself with a baseball bat

1    and was striking them in an effort to get -- to gain entry into

2    that entrance.

3        Additionally, during this investigation, law enforcement

4    discovered a social media video clip of the defendant, and that

5    was provided to the Court as well.  And in that social media

6    clip, you can see the defendant admits to possessing a baseball

7    bat and what his purpose was in entering the Capitol.  He even

8    states that he's not doing this for Trump.  He's doing this for

9    America.

10       And, lastly, the defendant did, in fact, surrender

11   himself to law enforcement.  He was persuaded by a family

12   member, who was a police officer, to turn himself in, and when

13   he was, in fact, arrested, he spoke to law enforcement and he

14   admitted to his actions.

15       So, Your Honor, you're left with a decision on whether

16   or not this individual is a danger to the community.  And the

17   first thing, the nature and circumstances of this offense alone

18   warrant the defendant to be held.  This was an incredibly

19   dangerous act.  And in defense counsel's opposition, they note

20   that no officer was injured by the defendant's action.  That's

21   actually not true because this group was acting in concert, and

22   their goal was to get inside the Capitol.  And numerous

23   officers are on medical leave because of what occurred that

24   day.  He was a part of this violent mob that caused these

25   actions.  Several officers are still being treated for what

1    occurred that day.

2           So just based on the nature and circumstances alone,

3    Your Honor can hold this defendant, but, additionally, the

4    strength of the evidence has -- the government has provided to

5    the Court, there's video evidence, there's the defendant's

6    admissions, and presumably there will be witnesses testifying

7    to what occurred that day.  This is a very, very strong case.

8           The history and character of the defendant:  He is 20

9    years old, and he does not have a prior record.  And there was

10   some note by defense counsel about his character, and I think

11   for that it may be best to address after defense counsel speaks

12   on that.  But the government will concede that he does have

13   a -- no record and he is a young individual.  We will point out

14   that the defendant was responsive to law enforcement.  He was

15   responsive to the Court when the Court asked him questions on

16   both Tuesday and today, and he was responsive when social -- on

17   social media when he was asked why he was there.  So I would

18   just point that out to the Court.

19          And, lastly, he is a danger to the community.  For

20   whatever reason, he armed himself with a bat, got (inaudible)

21   and thought I'm not deterred because there are law enforcement

22   in a uniform.  I am going to attack.  (Inaudible) how much

23   worse it could have been had law enforcement not been able to

24   hold this group at bay for a certain period of time.

25          So for all those, Your Honor, the government believes

1      that this is not a close call.  The defendant should be held

2      pending trial, and we'd just ask for a moment to respond to

3      defense counsel's representations with respect to his

4      character.

5              THE COURT:  I was on mute.  Sorry.  I was asking if

6      your computer is working now.

7              MR. SCARPELLI:  (Inaudible).  (Inaudible).

8              MR. LIGHT:  Your Honor, this is Gilead Light for the

9      United States.  I just want to let my colleague, Mr. Scarpelli,

10     know that I do have it cued up if he can't get it.  I can try

11     to show it right now.

12             MR. SCARPELLI:  That would -- that would be great.

13     My computer is -- looks like it's freezing again.

14             THE COURT:  That's fine.  Let's do that.  Give me one

15     second.  I will now need to somehow focus on your screen and

16     not Mr. Scarpelli's screen.

17             MR. SCARPELLI:  Judge, I think I've got it up now, if

18     you don't want to change back to the other screen.

19             THE COURT:  Okay.  Go ahead.  Okay.  I can see it.

20             MR. SCARPELLI:  Just by point of reference, the

21     defendant is right over here.  You can see his fist.

22             THE COURT:  Right there?

23             MR. SCARPELLI:  Yes.

24             THE COURT:  Okay.  Thank you.  I've seen it.

25             Okay.  Is that -- is that it, Government, for

1     your initial presentation?

2                 MR. SCARPELLI:  Yes, Your Honor.

3                 THE COURT:  Okay.  Ms. Harden, go right ahead.

4                 MS. HARDEN:  Thank you, Your Honor.

5           First, on behalf of Mr. Jackson, we enter a plea of not

6     guilty, assert all of his constitutional rights, including in

7     all further proceedings, and request that the Court release him

8     into the High Intensity Supervision Program.

9                 THE COURT:  Let me hear from Mr. Scarpelli.  Has he

10    been indicted?

11                MS. HARDEN:  He has not.

12                MR. SCARPELLI:  No, Your Honor.

13                THE COURT:  Okay.  Understood.  Go ahead.

14                MS. HARDEN:  No, he has not been indicted.  That's --

15    I make those representations to the Court.  I didn't make it

16    the last time.

17                THE COURT:  Right.

18                MS. HARDEN:  (Inaudible) to the Court.

19                THE COURT:  Got it.

20                MS. HARDEN:  Your Honor, this -- this situation

21    cannot be in our minds.  There is -- I won't spend any time

22    attempting to minimize the conduct on that day.  The issue

23    before the Court, though, is that it should be placed into

24    context in terms of how Mr. -- allegedly Mr. Jackson found

25    himself at this situation.

1    As I laid out in my memo, at about 1 o'clock, as the

2  Court knows, there was a "Stop the Steal" rally outside of the

3  White House where remarks were given by the Former President of

4  the United States where he described the presidential election

5  has been an "egregious assault on our democracy."  He then went

6  on in his speech and described the crowd as saying these are

7  people who are "not going to take it any longer" and encouraged

8  the crowd "to walk down Pennsylvania Avenue" saying "We're

9  going to the Capitol."

10    The President further riled the crowd by telling them we

11  will -- "We will 'Stop the Steal'" and:  You'll never take back

12  our country with weakness, you'll have to show strength, and

13  you'll have to be strong.  If you don't fight like hell, you're

14  not going to have a country anymore.

15    Now, again, the conduct cannot be minimized.  The

16  reality is that the person that's before you is a recently

17  turned 20-year-old severely challenged individual who at the

18  time of this incident had recently just experienced

19  homelessness and is now minimally, essentially, in a shelter

20  transitional housing program.

21    I do have some additional information that I would

22  ask -- I'm not sure how I can approach the bench, but --

23    THE COURT:  I can -- I -- okay.  We're going to go --

24  we're going to go into a private session here.  If you're ready

25  to do that --

```
1              MS. HARDEN:  I --

2              THE COURT:  Go ahead.

3              MS. HARDEN:  I --

4              THE COURT:  Okay.  So, Mr. Tran, you need to put the

5     government, Ms. Harden, myself, and the defendant in a private

6     breakout room so she can make additional representations to

7     (inaudible).  And that will be a sealed portion of this

8     proceeding.

9              (Proceedings were held under seal.)
```

















10    (Proceedings held in open court.)

11    THE COURT:  Okay.  For the record, Mr. Jackson has

12    indicated that he would like to say something, and I'm going to

13    have him speak to Ms. Harden first in a private breakout

14    session before we reconvene in the public portion of this

15    proceeding.  Go right ahead.

16    (Off the record.)

17    THE COURT:  Back on the record.

18    Ms. Harden, are you ready now?

19    MS. HARDEN:  Yes, Your Honor.

20    And so now I just want to address why Mr. Jackson is not

21    a danger to the community or a flight risk.  He has never been

22    arrested in his life.  At the time of these acts in

23    Government's Exhibit No. 5, how old he was, he said 19.  He's

24    actually 20, but he just turned 20 about 30 days before this

25    incident.  He's -- he doesn't have any criminal history

1   whatsoever, and there's no indication that he would or has ever

2   engaged in any kind of violence.  One thing that I think the

3   Court should know, Mr. Jackson doesn't even have a cell phone.

4   So in his ability to communicate, his ability to be involved in

5   anything in the future is -- is limited to -- to little to

6   none, at best.

7        Specifically when it comes to whether he is a danger to

8   the community, the Court should find that he is not based on

9   the -- based on his history, based on his background.  Again,

10  there is no ability for me to minimize the conduct.  I

11  appreciate what it stands for, and I appreciate Mr. Jackson's

12  alleged involvement.  Here, though, Mr. -- Mr. Jackson is not a

13  danger to the community.

14       With respect to risk of flight, Mr. Jackson could not

15  have taken better steps to establish to this Court that he is

16  not a risk of flight.  Once the FBI flyer was put out -- the

17  FBI didn't know Mr. Jackson's name, (inaudible) who he was, and

18  nobody dragged Mr. Jackson down to the FBI.  Mr. Jackson saw

19  the flyer, and he voluntarily surrendered to the FBI building,

20  so unaware that he should turn himself into a police station.

21  The FBI agent drove him from the FBI building to the

22  First District police department.  I think that speaks to his

23  lack of danger as well.  I make these representations upon

24  information and belief that he was not handcuffed during the

25  transport as well.

1          He was taken into the First District police station

2     where there are authorities of the government.  He waived his

3     rights.  And in one of those videos, as the Court has seen, he

4     has been -- he has been -- he's been impressed by some kind of

5     propaganda where he was saved, that we have been taken over by

6     globalists, and we have been taken over by the Chinese.

7          He is not a risk of flight.  He is not a danger to the

8     community.  (Inaudible) a person with no criminal history, and

9     I ask the Court to fashion a combination of conditions of

10    release that would ensure the safety of the community, as well

11    as his return to court.

12         One other thing I would note is that because of his

13    mental challenges, within a -- it looks like 24 hours of

14    getting to the jail, they placed him in protective custody.

15    Now, sometimes that would be okay, but that -- and during

16    corona, Your Honor, you -- he has been placed on a 23-hour

17    restriction.  He's having no contact with the outside world.

18    He was unable to call me.  This is propounding his anxiety and

19    depression.  It is not an appropriate situation for Mr. Jackson

20    to be held in.

21         The Court can assure the safety of the community by

22    placing him on electronic monitoring, placing him in a

23    High Intensity Supervision Program, with an order to return

24    to court at whatever time.  I would respectfully request

25    that --

1          THE COURT:  Where would he live?

2          MS. HARDEN:  At -- at the place that I told the Court

3    earlier that I received (inaudible).  He's actually in a

4    program that I -- through both DHS and that place that I told

5    the Court about earlier and --

6          THE COURT:  (Inaudible).

7          MS. HARDEN:  I have been in touch with them.  He is

8    welcome there.  There's no question that he can return.  That's

9    where the Court should allow him to reside.

10         THE COURT:  Okay.  Government, anything further?

11   You're -- you're --

12         MR. SCARPELLI:  I'm sorry, Your Honor.

13         Very briefly.  The government's information is that a

14   family member persuaded the defendant to surrender, for what

15   it's worth.

16         And, additionally, you know, the focus on his

17   limitations, I think, shouldn't weigh so heavily when the Court

18   has all these other factors to consider, including the nature

19   and circumstances of the offense, the strength of the evidence

20   in this case, and his conduct.  I -- I do not see how the Court

21   can assure that the community will be safe bringing the

22   defendant back in this shelter area and presuming -- he must

23   have learned the information about globalization and/or the

24   Chinese taking over in some fashion.

25         So it gives the government great pause for the defendant

1    to be released with specific conditions, and we'd ask that he

2    be held without bond.

3              THE COURT:  Okay.  I'm going to take five minutes,

4    and I'll come back and I'll rule.

5              MS. HARDEN:  Thank you, Your Honor.

6         Mr. Tran, can you put Mr. Jackson and myself in a

7    breakout room for four minutes so that we're back in time?

8              (Off the record.)

9              THE COURT:  Okay.  This is Judge Harvey.  We can go

10   back on the record in the Emanuel Jackson case.

11        I neglected to ask -- and I do want to put on the record

12   what the recommendation is of pretrial services in this case.

13   Who's here for pretrial?

14             THE PRETRIAL SERVICES OFFICER:  Good afternoon,

15   Your Honor.  Christine Schuck, pretrial services.

16        Pretrial's recommendation is there are no combination of

17   conditions that will ensure the safety of the community or his

18   appearance in court.

19             THE COURT:  Okay.  I was aware of that recommendation

20   previously; that is, the recommendation -- or was the

21   recommendation of pretrial in its pretrial service's report.

22        I have seen a great number of these cases in the past

23   week and a half, cases arising from events at the Capitol on

24   January 6th, perhaps more than any other judge just due to the

25   fact that I'm on criminal duty this month for the District of

1    Columbia.  So most of the cases have come across my desk at

2    some point.  But my view is having sought and (inaudible)

3    recommendation to the Court (inaudible) defendants who

4    represent the grand scheme (inaudible) community or risk of

5    flight and those who don't.

6         Although the events at the Capitol last week for

7    (inaudible), the government has not sought pretrial detention

8    in all of these cases and for a good reason that I should not

9    do so.  Most of the cases brought thus far have been for

10   misdemeanors, for unlawful entry into the Capitol and

11   disorderly conduct.  Many of those defendants have never been

12   charged with prior convictions or contacts in the federal

13   justice system.  In such cases, pretrial detention should be,

14   in my view, rare.  But this is not such a case.

15        While the defendant has no prior conviction, he's

16   apparently had no prior conduct with the criminal justice

17   system -- and he's young.  To his credit, he -- it does appear

18   that he turned himself in, even involved advice of the family.

19   Those are not the only factors the Bail Reform Act requires the

20   Court to consider in making its decision according to pretrial

21   detention.

22        The Bail Reform Act also requires the Court to evaluate

23   the nature and circumstances of the offense charged and the

24   strength of the government's evidence with respect to

25   defendant's guilt.  I find that both of those factors, as well

1  as the danger the defendant's release would represent to the

2  community, weighs strongly in favor of his detention.

3          The defendant is charged not only with misdemeanor

4  offenses that others have been charged with arising from the

5  events at the Capitol on January 6th, but he's also charged

6  with multiple serious federal felony offenses based on what the

7  government alleges that he did that day.

8          He's charged with assault on a police officer of the

9  United States, a second assault on a police officer of the

10  United States with a dangerous weapon.  That first charge

11  carries up to 8 years in jail; second, 20 years in jail -- up

12  to 20 years in jail.  He's also charged with obstruction of an

13  official proceeding, another federal charge that carries up to

14  20 years in jail.  These are very serious federal charges.

15          But I must not only consider what the charges are that

16  the government has brought against the defendant or what it is

17  they are alleging he did.  (Inaudible) nature and the

18  circumstances of the offense.  And according to the complaint,

19  the defendant physically and violently assaulted members of

20  law enforcement twice that day.  Each assault hours apart.  On

21  both occasions, it appears, the defendant rushed entrances to

22  the Capitol, violently assaulted police officers who were

23  protecting the Capitol or members of Congress who were on that

24  site.

25          The second time, hours after the first assault, he

1    apparently beat a police officer repeatedly with a steel bat.

2    Thus, the complaint does not describe Mr. Jackson's passive

3    participation in events at the Capitol, his nonviolent

4    participation in events at the Capitol, nor even (inaudible)

5    recent (inaudible) on his part.  It describes someone who was

6    actively engaged in a sustained and violent assault of a

7    Capitol police and law enforcement officer (inaudible)

8    protected the members of Congress who were in session in that

9    building on that day.

10        Congress was, in fact, disrupted from performing its

11   constitutional duty that day because of the actions of the

12   defendant and others.  They forcibly pushed into the Capitol,

13   from all reports, and members of Congress were in fear of their

14   own personal safety, even of their lives, understandably so.

15   People did die that day.  It could have been even worse, but

16   with the quick thinking, heroic activism inside the Capitol

17   (inaudible), but for all of those things.  The violent, armed

18   assault on the Capitol Police by the defendant, who would

19   appear was a willing and active and violent participant, could

20   have made it worse than it was.  So I take all of that into

21   consideration.

22        All in all, I look at the offense, the charges, and the

23   circumstances of those offenses, and it does appear to me the

24   defendant is an individual who will engage in an act of

25   violence, appears unable control himself with respect to

1   (inaudible), has little to no respect for law enforcement or

2   authority.  (Inaudible) the actions that he's alleged to have

3   done show extreme disrespect for (inaudible) authority that

4   this Court represents.

5       (Inaudible) problem including some (inaudible) he

6   admitted doing according to the government's proffer.  Will he

7   listen to what I say and comply with conditions of release that

8   I might set that will reasonably assure the safety of the

9   community?  I would also note that the government's evidence in

10  this case, seems to me, is very strong.  I've seen all videos

11  now, and they do appear to show a violent assault on

12  United States law enforcement officers who were seeking to

13  protect entrances into the Capitol, one of which involves the

14  use of a dangerous object, a metal bat.  Apparently the

15  defendant has also admitted that is him in those videos and he

16  did what those videos show him doing.  So I do believe the

17  government has a very strong case, which is another factor the

18  Bail Reform Act requires that the Court look at.

19      I considered what was stated in the sealed portion.  I

20  can't go into detail about it.  Ms. Harden has indicated he's

21  dealing with some issues with respect to mental health.  I have

22  considered that.  I do not believe it's appropriate to gain --

23  to detain someone solely because they may be suffering

24  from -- from mental health issues (inaudible).  That is not the

25  case here.  It's much more than that that I believe underlies

1    my decision that pretrial detention here is warranted.

2            In any event, the D.C. Circuit has indicated that the

3    fact that someone may be suffering from some mental instability

4    is one factor that a judge must consider in making his

5    detention determination.  So that doesn't inform my decision,

6    and I will support that decision (inaudible).

7            Finally, I'm not blind to the pack that appears to have

8    driven the defendant to do what he did on January 6th.  I think

9    that also informs my decision of what caused the defendant to

10   do what he did, whatever incited it has not, in my view, gone

11   away.  Only we can add that to the events of the Capitol.

12   Passions are still running high.  In that environment, I have

13   no confidence that whatever (inaudible) the defendant did, was

14   alleged to have done, whether it's the statements made by the

15   Former President, mental health issues he suffers from, or just

16   his own very poor judgment.  I have no confidence that in that

17   environment he won't be driven by whatever it was that

18   (inaudible) violent acts (inaudible).  (Inaudible) evidence

19   that I cannot fashion a combination of conditions that would

20   reasonably assure the safety of the community, and I order that

21   he be held pending trial.

22            Does the government have anything further in which to

23   accomplish here today?

24                    MR. SCARPELLI:  No, Your Honor.

25                    THE COURT:  Ms. Harden?

1        MS. HARDEN:  Your Honor, I would ask the Court make a

2   recommendation to place him at CTF.  Obviously he's young.

3   They have -- I don't know that it's happening in corona, but

4   they have at least a young and emerging program (inaudible)

5   that will allow him -- while not ordering BOP to transfer him

6   there, make a recommendation that he be placed at CTF.

7        THE COURT:  Does the government have any objection to

8   making that recommendation (inaudible) heard in this

9   proceeding?

10        MR. SCARPELLI:  Based on what I heard, Your Honor,

11   the government has no objection.

12        THE COURT:  All right.  I will make that

13   recommendation, Ms. Harden.  (Inaudible).

14        MS. HARDEN:  Very well.

15        THE COURT:  I'll make that recommendation for --

16   recommend he be housed pretrial (inaudible).

17        Mr. Tran, please ensure that that is reflected in the

18   docket and -- and transfer the paperwork over to the marshals

19   service at the D.C. jail.

20        Anything further, Ms. Harden?

21        MS. HARDEN:  Nothing further at this time.

22        THE COURT:  Do we have a next date?

23        MS. HARDEN:  I apologize.  We do not, Your Honor.  I

24   might be asking for a preliminary hearing, Your Honor.  So I

25   would ask -- I -- I thought that (inaudible) indicated we could

1    do it the same time today.  Obviously that's not going to

2    happen, as the Court already mentioned (inaudible).

3               (Indiscernible simultaneous cross-talk.)

4            THE COURT:  What I had suggested was we wait to -- it

5    was based on my decision to impact how much time the government

6    has.  (Inaudible).  So we could, if you wish, do a preliminary

7    hearing within two weeks from his initial appearance --

8            MS. HARDEN:  Yes.

9            THE COURT:  -- which I'll have to calculate.  When

10    was it?  You tell me.

11            MS. HARDEN:  The initial appearance was on the 19th,

12    Your Honor, and so I would ask for -- February 2nd would be the

13    earliest date, although I'm not asking the Court to set that

14    date.  I think sometimes these limits are outer limits because

15    I think the government has that long, but I think the Court,

16    under the Court's discretion, can order an earlier hearing.  I

17    would ask the Court do that in this case.

18            MR. SCARPELLI:  Your Honor, the government --

19            THE COURT:  Yes, Ms. Harden.  What -- what date do

20    you suggest?

21            MS. HARDEN:  February [sic] 29th, one week from

22    today.

23            THE COURT:  Government.

24            MR. SCARPELLI:  The government has no objections to

25    that date.

```
 1              THE COURT:  Oh, okay.  (Inaudible).
 2              MR. SCARPELLI:  Yeah.
 3              THE COURT:  All right.  Let's do January -- I'm
 4    sorry -- 29th or 28th?  What did you say, Ms. Harden?
 5              MS. HARDEN:  29th.  I apologize.  29th, Your Honor.
 6              THE COURT:  Okay.  That's next Friday.  You know
 7    my -- my schedule is pretty crazy.
 8              MS. HARDEN:  I'm (inaudible) -- I do.  I would ask
 9    for the afternoon, if that's possible, Your Honor.
10              THE COURT:  That would work.  If I call this case at
11    1:00, the nondetention cases will follow, and, you know, as we
12    (inaudible).  I already have multiple cases that I'm hearing.
13    So I think your best shot at not being held up all day is to
14    schedule this, say, at 11:30 on Friday, the 29th.
15              MS. HARDEN:  I'm prepared to do that.  I have another
16    matter before Judge Kelly at 10 o'clock.  I will make sure that
17    I am ready to appear at this hearing at 11:30.
18              THE COURT:  Okay.  Mr. Scarpelli, does that work with
19    you?
20              MR. SCARPELLI:  That does, Your Honor -- Your Honor.
21              THE COURT:  Okay.  11:30.
22              MS. HARDEN:  Your Honor, the Court did mention the
23    (inaudible).  I know I'm probably pushing to ask for this, but
24    is the Court available on the 27th?
25              MR. SCARPELLI:  That -- that wouldn't work for the
```

1    government.  I think the earliest we could do is that Friday.

2    I could -- we -- we could do it the following Monday, if

3    that's --

4        MS. HARDEN:  You know, I'm just concerned.  I was

5    concerned.  I would ask for the 29th to remain, Your Honor.

6        MR. SCARPELLI:  Okay.

7        THE COURT:  The 29th at 11:30 for a preliminary

8    hearing.

9        All right.  Mr. Jackson, we'll be back here where the

10   government will have to demonstrate probable cause to believe

11   these crimes that you've been charged with have occurred and

12   you committed those crimes.  So I'll see you back here.  That

13   will be another virtual hearing at 11:30 on January 29th,

14   assuming the government hasn't indicted these before.  Then

15   there would be no preliminary hearing.

16       All right then.  Anything further from the government?

17       THE DEFENDANT:  Can I speak (inaudible) after this?

18       THE COURT:  All right.  How about -- do you want to

19   speak to your attorney, Mr. Jackson?

20       THE DEFENDANT:  Yes.

21       THE COURT:  All right.  Mr. Tran, please (inaudible)

22   the parties and Mr. Jackson in a room, in a breakout room.  Are

23   there any other (inaudible)?

24       MS. HARDEN:  Okay.  Very well.  And so do we really

25   need to return to this court after we speak in a breakout room?

1      Correct; Your Honor?

2                  THE COURT:  You're done.  You're excused.

3                  (The proceedings concluded at 12:58 p.m.)

1          <u>CERTIFICATE</u>

2          I do hereby certify that the foregoing is a true,

3     correct, and complete transcript of the audio-recorded

4     proceedings in this matter, audio recorded on January 25, 2021,

5     and transcribed from the audio recording to the best of my

6     ability, and that said transcript has been compared with the

7     audio recording.

8          Dated this 28th day of January, 2021.

9

10                         /s/ Nancy J. Meyer
                           Nancy J. Meyer, Official Court Reporter
11                         Registered Diplomate Reporter
                           Certified Realtime Reporter
12                         United States Courthouse, Room 6509
                           333 Constitution Avenue Northwest
13                         Washington, DC 20001
                           202-354-3118
14                         nancy_meyer@dcd.uscourts.gov

15

16

17

18

19

20

21

22

23

24

25